**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARK TURNER,** | ) | CASE NO.  07 CV 00163 |
| | ) | |
| PLAINTIFF, | ) | **JUDGE: JAMES S. GWIN** |
| | ) | |
| vs | ) | |
| | ) | **MOTION IN LIMINE** |
| **LIBERTY MUTUAL FIRE** | ) | **TO EXCLUDE TESTIMONY** |
| **INSURANCE CO.,** | ) | **OF DEFENDANT'S EXPERT** |
| | ) | **HAROLD FRANCK** |
| DEFENDANT | ) | |

　　　MARK TURNER,  by and through counsel,  respectfully moves the court
to exclude the testimony of defendant's proffered expert,  Mr. Harold Franck,
because his testimony does not comply with *Daubert v. Merrell Dow Pharmaceuticals*,
*Inc,* 509 U.S. 579 (1993) and its progeny, or Fed. R. Evid. 702.  This motion is supported
by the deposition of Harold Franck,  deposition of Ohio State deputy fire marshall,
Charles Hanni,  exhibits attached hereto, and the reasons set forth in
the  memorandum of law filed herewith.

　　　　　　　　　　Respectfully Submitted,


　　　　　　　　　　　　　　　/s/ Richard N. Schwartz
　　　　　　　　　　　　　　　Richard N. Schwartz #0029189
　　　　　　　　　　　　　　　Brett A. Housley #0070612
　　　　　　　　　　　　　　　UAW-GM Legal Services Plan
　　　　　　　　　　　　　　　1570 S Canfield-Niles Road
　　　　　　　　　　　　　　　Building B, Suite 101
　　　　　　　　　　　　　　　Austintown, OH 44515
　　　　　　　　　　　　　　　(330) 799-7711
　　　　　　　　　　　　　　　FAX: (330) 799-5220
　　　　　　　　　　　　　　　Attorney for Plaintiff
　　　　　　　　　　　　　　　Email:
　　　　　　　　　　　　　　　RichardSc@uawlsp.com
　　　　　　　　　　　　　　　Brettho@uawlsp.com

CERTIFICATE OF SERVICE

This is to certify that a copy of the Motion in Limine to Exclude testimony of Defendant's expert, Harold Franck, has been electronically filed with the court and mailed to Attorney William Harter, Frost, Brown, and Todd, One Columbus, Suite 2300, 10 West Broad Street, Columbus, Ohio 43215-3484, on this 4th day of September 2007.

s/Richard N. Schwartz<br>
Brett A. Housley<br>
Attorneys for Plaintiff<br>
Mark A. Turner

# I. INTRODUCTION

Defendant's expert witness, Harold Franck, P.E., does not withstand scrutiny under Rule 702 of the Federal Rules of Evidence or the Supreme Court's interepretation of Rule 702 as set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and it's progeny. Consequently, his testimony should be excluded.

Plaintiff has no objection, however, to defendant's other hired expert, Lee West, of EFI Global, who defendant has designated to testify at trial on its behalf.

# II. BACKGROUND

This case came about as a result of a house fire that occurred on January 25, 2006 in Diamond, Ohio. A neighbor called Mahoning County 911 to report the fire at 8:40:50 a.m. and volunteers from the Milton Township Department arrived shortly thereafter.

The structure was completely collapsed into the basement with no vertical walls or floor spaces remaining, report of the Ohio State Fire Marshall. [Doc.72-3].

Four (4) on site investigations into the fire's cause were conducted by various departments, Milton Township Fire, Milton Township Police, Ohio State Fire Marshall Office, and private consultants, EFI Global, Inc., and Churchwell Fire Consultants. All came to the same conclusion that the origin and cause of the fire is undetermined.

Defendant proffers testimony of electrical engineer, Harold Franck, P.E. who concludes that the cause of the fire is incendiary. Franck did not visit the site of the fire, and did not perform testing of any physical evidence, specifically an electric heater suspected of malfunctioning and causing the fire. As pointed out below, Franck's conclusion was developed through a series of assumptions that he sets forth in opinions

stated in two (2) written reports.    His first report was issued around November of 2006. In that report, Franck expresses an opinion based upon mathematical calculations consisting of heat release ratio's, and an assumed timeframe of the progress of the fire. His second report (Exhibit 2) uses different assumptions as to the timeframe of the fire, other variables not considered in the first report.  As part of his second report, Franck employs the use of a computer simulation to simulate his theory of the behavior of the fire.   Both reports and the opinions are based upon unsupported speculation.  Without any physical evidence whatsoever, he puts his expert seal on unreliable methods in the determination of cause and origin of a fire.

### III ARGUMENT

The opinion offered by defendant's expert, Mr. Franck, should not be considered at trial because his opinion does not satisfy the test for admissibility of expert testimony under Federal Rules of Evidence, Section 702 and *Daubert*.

### A.   The test for admissibility of Expert Testimony

The opinion offered by defendant's expert, Harold Franck, is not premised upon reliable principles and sound methods.    Nor is the Franck opinion based upon accurate factual data. Simply stated, Franck's testimony is based on subjective belief and unsupported speculation, and is not scientifically substantiated..   Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue,  a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The current version of Rule 702 has been effective since December 1, 2000, when Amendments incorporated prerequisites for reliability that had been developed by federal courts. In 1993, the U.S. Supreme Court re-examined the admissibility of expert testimony under the previous version of Rule 702 in *Daubert v. Merrell Dow Pharaceuticals, Inc.,* 509 U.S. 579 (1993), giving guidance to lower courts on how to evaluate the qualifications of the proposed expert, and the minimal reliability that must by required of proposed testimony. The *Daubert* court rejected exclusive reliance on the "generally accepted" test as a determination of admissibility, instead identifying a nonexclusive list of factors to assist the court in it gatekeeping role.

> *Daubert* set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. The specific factors explicated by the *Daubert* Court are (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense or whether it is instead simply a subjective, conclusory approach that cannot be reasonably assessed for reliability; (2) whether the technique or theory has been subjected to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R Evid. 702 (Advisory Committee Noes, 2000 Amendments); *see* also *United States* v. *Bonds*, 12 F.3d540, 555 (6th Cir. 1993) (rejecting "general acceptance test and adopting *Daubert*).

In speaking to the court's gatekeeper role, the *Daubert* court noted that "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 590 U.S. at 595. The court reasoned that "because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* In

addition, the Court stressed that, ab initio, "in order to qualify as scientific knowledge, an inference or assertion must be derived by the scientific method. " *Id*. At 590

In post- *Daubert* decisions, the Supreme Court has also warned against accepting Opinion evidence that is connected to existing data only by the ipse dixit ("because I said so") of the expert, see *Joiner v. General Electric Co.,* 522 U.S. 136, 146 (1997), see also, Fed. R. Evid 702 (Advisory Committee Notes, 2000 Amendments) ("trial court's gatekeeping function requires more than simply taking the expert's word for it").

As the Sixth Circuit has noted, *Daubert* held that Rule 702 imposed both a reliability and relevance (or "fit") standard for proposed expert testimony; the testimony must be both grounded in the scientific method and also helpful to the trier of fact in understanding the evidence or determining a fact in issue, *Bonds*, 12 F.3d at 555.

Both the *Daubert* Court and the federal courts of this state emphasize the importance of the reliability factor and the importance of testing and and testable. In *Knotts v. Black and Decker*, 204 F. Supp2d 1029 (2002) U.S. District Court, N.D. Ohio, Western Division, the court stated:

> "Regarding the reliability factor, a trial court must focus on the soundness of the expert's methodology," citing *Smelser v. Norfolk Southern Ry, Co*, 105 F.3d 299, 303 (6th Circuit), cert denied, 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997). "An expert opinion that is based on scientifically valid principles will satisfy Fed. R.Evid 702; and expert's subjective belief or unsupported speculation will not. Id., citing *Daubert v. Merrell Dow Pharmaceuticals, Inc*. (on remand), 43 F.3d 1311, 1319 (9th Cir.) Cert. denied, 516 U.S. 869. Finally, the party offering the expert testimony bears the burden of proof establishing its admissibility. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796.

**1. Insufficient Facts and Date to support Franck's opinion**

Mr. Franck did not demonstrate that his opinion is based on sufficient facts and data as required by Fed. R. Evid 702 (1).

In Franck's first written report, [exhibit 1] pg. 2 , he states that he reviewed the following:

1. Photographs provided by the insured, a witness, the fire chief, and various investigations were reviewed.

2. The fire report and the police report were reviewed.

3. The recorded statement of the insured were reviewed.

4. A diagram of the home provided by the insured was utilized to construct a scaled diagram of the structure. This diagram was utilized to perform time calculations based on the contents of the structure and the floor plan.

5. Pertinent literature was reviewed in order to perform time calculations based On the heat release rate of materials.

At Franck's deposition on August 24, 2007 in Charleston, West Virginia, Franck testified that the calculations he performed [exhibit 1, pg. 5] were "rough" calculations. (Franck depo, exh. 3, pg 12, lines 11-17, pg. 18, line 1, pg. 19,lines 5-10, pg. 21) Further, when asked about whether he considered variables relevant to his causation analysis in his first report , such as ventilation, e.g. affect of open doors or windows in the house on the progress or spread of the fire, Franck testified that he did not take such variables into account in his first written report. Franck testified that he did, however, take such factors into account in his second report issued on or about July 2007 (Harold Franck depo, exh. 3, pg 29.).

Upon deposition, then, Franck conceded that his first report was analytically deficient and the calculations were not reliable. He did so when pressed about the factual assumptions made concerning the calculations. For example, Franck testified that the heat release ratio of the house content material [room contents, e.g. couch, tables] Franck used to measure kilowatt's in each room (exhibit 1, page 5) were only "rough" values, and not an accurate measurement of the actual fuel load in each of the 9 rooms or areas. (Exhibit 3, and see Franck dep. At p. 15, line 18 to p.26, line 1, exh. 3). Upon closer scrutiny at his August 24, 2007 deposition, and upon questioning regarding the mathematical data (e.g. kilowatts) at page 5 of Franck's report (exh.1, pg 5) regarding each room in the house , Franck conceded then that the factual data he used for each room of the house was only a rough estimate (Franck Depo at p. 16, line 1 – p.26, line 1.

Federal Rule of Evid 702, as under *Daubert*, provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. As the court noted in *In re Paoli R.R. Yard PC litig*., 35 F.3d 717, 745 (3d Cir. 1994), " *any* step that renders the analysis unreliable…renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology," Advisory Committee Notes to Fed. Rule of Evid 702. The guidelines of the National Fire Protection Association (NFPA 921) (2004 edition) states that "during this period of development (the growth of a given fire in its preflashover phase), the rate of fire growth is determined by the heat release ration (HRR) from burning of individual fuel arrays, NFPA 921, section 5.4.2.1.

The fact that Franck relied on HRR numbers that were admittedly "rough" estimates  shows that a major factor in Franck's analysis as to the growth and speed of the fire was not properly considered.

The following colloquy from the deposition (Exhibit 3,  depo at pp. 20-21) serves a an example of the inaccuracy of the factual data used by Franck: :

Question:   How about the dining room:  How did you arrive at that calculation?

Answer:   Again, the same thing.  I looked at what was inside the dining room. you have table and chairs, about 6,000 KW for tables and chairs.

Question:   And, did you take into account, likewise, in the family room, the contents of that room and arrive at the calculation similarly?

Answer:   Yes, Yes, they're rough calculations.

Question:   When you calculated this value,  did you take into account other variable,such as—what other variables would you take into account?

Answer:   There are no other variables that you can, with a hand calculation.  There's no other way to calculate it.  You can reach a time for flashover, that's all.

Question:   I see,   So, is it fair to say then… Is it correct Then that this hand calculation based on these, this data, Will not take any other factors or variables such as the Difference in the construction of the way the roof or Ceiling in a room is constituted?

Answer:    Right

…

Because Mr. Franck's kilowatt data was "rough," Franck's time frame (3383 seconds or 56 minutes) (Exh. 1, pg. 5), the next step in his analysis,  is thrown off, and therefore, unreliable.

The time frame deposition testimony of Franck,  is as follows:

Question:  Is it true then, …  in your opinion, given that the hand
               calculation that it's, it is somewhat limited on how rough
               it can be **in terms of the time frame?**

Answer:  It is.

(Exhibit 3, Franck depo at p.22, lines 9-13)

Franck's data , he concedes at his deposition,  was deficient in failing to consider

other  important  variables e.g. many windows, floor to ceiling in dimension,  in

determining whether the behavior of the fire was consistent with an accidental or an

incendiary fire.  [exh. 3, Franck depo. at p 22.  ].      Franck does attempt to explain away

the fact that he did not use accurate data in his initial report/analysis by asserting that he

used accurate data in his subsequent report (Exhibit 3,  Franck depo at p. 29).   As will be

pointed out later in this motion,  Franck's subsequent report consists of unsubstantiated

speculation,  and is not reliable.

The core of Franck's opinion [that the fire was incendiary] is based upon two (2)

pictures of the house taken at the fire scene by a witness, Joseph Jimmo.   Allegedly, Mr

Jimmo was trimming trees in the area and took pictures of the fire in progress

Franck relies solely on the Jimmo pictures  [exhibit 1, appendix B, 1 & 2],  to

conclude  that the pictures depict that the fire was in full involvement and that "such fire

involvement as depicted in the photographs can only be produced if the fire originates at

multiple locations and is accelerated."   [exhibit 1, pg. 6].

This conclusion is based on unsupported speculation.      The time that the

Jimmo pictures were taken has not been documented or authenticated.   In his first

undated report,  (Exhibit 1), Frank states at page 1:

"This analysis is based on calculations for the evolution of the fire relative to the time frame that has been established for this fire.  The results of this investigation revealed that the fire evolution could not have developed as rapidly as it did without the introduction of accelerants into the floor surfaces of the home.  The photographic evidence indicates that the fire originated in all the rooms of the home at approximately the same time. Therefore the fire must be classified as incendiary."

Franck's opinion is fundamentally flawed as it is based upon data that is admittedly not accurate or amounting to "rough" calculations.  The individual taking the pictures, Mr. Jimmo,  has not, under oath, either by affidavit or deposition, authenticated the pictures taken nor the time the photos were taken.     Moreover, Franck's analysis of the growth and speed of a fire ,  among other things,  is based upon uncertain or "rough" estimates of heat release ratio leading to an erroneous  conclusion as to why the fire behaved as it did,  *see O'Conner v. Commonwealth Edison Co*., 13 F.3d 1090 (7th Cir. 1994) (the more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable.  Expert testimony based on a completely subjective methodology held properly excluded).

In Franck's first report,  Franck 's analysis of the length of time the fire was burning assumes that the pictures were taken at 8:30 a.m.    When plaintiff objected to this 8:30 a.m. time assumption,  Franck issued second,  undated report, entitled "subsequent report."  (exhibit2).   The subsequent report used different assumptions, and stated, at page 2:

Review of Findings

1.    The deposition of Mark Turner

2.    It was assumed that Mr. Turner left home at approximately 7:40

3.    It was assumed that 911 was called at 8:41 a.m.and that his photographs
Were taken immediately afterward.

4.  The dimensions of the home and its contents were determined from the Photographic and diagrammatic evidence provided by Mr. Turner

5.  The structure was modeled with AUTOCAD.

6   Four fires were simulated with the National Institute of Standards and Technology Fire Dymanics Simulator (Version).

Even if one were to assume that the Jimmo pictures were taken at a given time, say, for example, between 8:41 a.m. – 8:50 a.m, that is, when the 911 call was made reporting the fire, Franck makes additional assumptions not supported by any factual data. For example, at Franck's deposition, he testified that he was not aware that the house had 6 skylights. (Exhibit 3, Franck depo. p. 52, lines 17 -18).

The deposition testimony adduced as to the skylights, as follows:

Question: (Schwartz) This photograph, which is the Liberty Mutual's number I don't have a view from the top. (referring to a picture of the plaintiff's roof showing numerous skylights on the roof)

Answer:   (Franck) Yes.

Question: (Schwartz)  There are skylights in the house.

Answer: (Franck)   There are?

Franck did not know the plaintiff's home was built with numerous skylights. Therefore, Franck's computer fire dynamic simulations did not include an important factor in his computer simulation that could influence the fire spread. If, for example, the skylights failed forcing oxygen into the house causing the windows to fail, the fire could progress quickly and be consistent with an accidental fire. So says the Ohio State Fire Deputy Marshall Investigator, Charles Hanni, at his deposition. Hanni expressed the importance of factoring the skylights into an analysis of the determination of whether a fire is accidental or incendiary. (exhibit 4, Hanni depo at pp. 26-27). He states:

Ohio State Fire Marshall Hanni:

"Let's see.   I have photos of the house before the fire. These are
skylights.  The house doesn't have a peaked roof; it has a flat roof
if this fire develops anywhere in the house, if you look at
Mr. Turner's photos of his inventory, and you see the house,
the construction fo the house prior to the fire, it's all open
floor plan.   I'd have to look at the pictures again, but there
are areas where there is no ceiling in the room.  It just extends to the
second floor.

If a fire develops in the first floor, its going to go – the heat and
gases are going to go to a ceiling level.   If the ceiling is on the
second floor, that's the level that they're going to go to.  As a fire
develops, these skylights are going to fail.  Once those skylights
fail – those are probably Plexiglas.  I'm not – I couldn't say. I won't
say what the material of the skylights were.  But once these skylights
fail, then you have a fireplace.  You have air being drawn in from
the bottom and forced out through the top.  You have a draft and
a chimney effect, which may explain why the house became fully
involved so quickly.

Question:   So do I understand then, its your opinion, from your
observations here…that the fully-involved fire and progression
Can also be explained—

Answer:   Due to the construction.

Question:   --due to the construction of the home, versus the way
Mr. Franck explains it, due to a  set fire is that correct?

Answer:   Yes,  What I'm saying is, its undetermined what may have
caused the fire.  I can't say it's incendiary because of the
construction of the home.

Where,  as here,  the underlying data has not been properly evaluated,  and

Franck's opinion consists of  irrational explanations of why he believes the behavior of

the fire shows it was accelerated, there exists a logical gap which undermines any

semblance of reliability in Mr. Franck's opinion.

## 2.   Failure to Apply Reliable Principles and Methods to the Facts

At his deposition,  Mr. Franck testified that he performed no testing on the electric space heater,  nor did he consider it the possibility that a space heater malfunction could have been a cause of the fire.   It is undisputed that Franck did not physically examine the electric heater.  Also,  Franck testified that he did not consider the possibility that a reported  electric panel defect could have been an alternate explanation for an accidental cause of the fire.       Franck simply opined that could rule out these alternative explanations of the origin of the fire by pointing to the 2 pictures of the fire in progress taken by Jimmo  and summarily concluding  that the pictures were consistent with origination at  multiple locations and is accelerated.

It is evident that  Franck did not exclude such possibilities of an alternative cause of the fire in any methodical, reasonable or reliable fashion. Franck's deposition testimony shows he did not examine or test the electric heater for malfunction (Exhibit 3, depo at p 41.)  And,  Franck's deposition testimony admits that the propane tank leak could have caused the fire to accelerate, although he later attempts to further explain that this scenario is unlikely. ( Exhibit 3,  depo. at pp. 39-40).

Franck simply speculates that the fire was accelerated without supporting evidence of the existence of  accelerates  and without any substantiation of the origin of the fire or the location of the accelerates.

Such an opinion falls short of the requirements of *Daubert*.  [As pointed out earlier, in post *Daubert* decisions, the Supreme Court has warned against accepting opinion evidence that is connected to existing data only by the ipse dixit ("because I said so") opinion of the expert.  In *Knotts v. Black and Decker*, 204 F.Supp2d 1029 (2002),

U.S.District Court, N.D. Ohio, Western Division, the court disallowed the expert's

testimony, and stated:

> A similar situation was presented in… where an
> expert's testimony was disallowed…on the issue of the fire's
> origin. There, the expert opined that the cause of the fire
> was intentional as all accidental causes were eliminated and he
> could not identify the ignition source. *Id*. At p. 921. The expert
> was also unable to explain his methodology for eliminating a
> potential source of origin and the district court determined that his
> opinion on the incendiary cause was without a rational explanation
> and insufficient to assist the jury. *Id.. Knotts v. Black and Decker, Inc.*
> 204 F. Supp. 2d 1029, p. 12.
> …
>
> " …A court may conclude that there is simply too great an analytical
> Gap between the data and the opinion offered, " *Knotts v. Black &*
> *Decker, Inc.* 204 F.Supp.2d 1029, p. 12.

Moreover, Franck's opinion is inconsistent with the NFPA guidelines that

require investigators to exclude all other origins and causes. (NFPA 921, section 2-3.6

1999 edition). And, Franck did not conduct an independent investigation to determine

an electrical failure in the space heater.

Thus, Mr. Franck will not assist the jury in determining the cause or origin of the

fire as he cannot document the cause or origin by either reliable scientific evidence or

reliable methodology.

### 3. Franck's use of the computer simulation of the Fire is not reliable

Franck testified upon deposition of 8/24/07, that prior to this case:

(1) he never performed a fire dynamics simulation (Exh. 3, depo at p.63)

(2) he has never taken a class, or seminar and has not participated in any

training on the subject of Fire dynamics simulation, as performed in this case. (Exh. 3,

depo at pp. 5-6).

(3)   that while Franck has performed electrical simulations in the past as an engineer, he has never performed any simulations in the relevant field of fire dynamics. (Exh. 3, p 8).

(4) Franck was unable to cite any specific study, material or literature  nor was he able to site any publications (other than those Franck employed in his report ( National Institute of Studies and Technology) that have peer reviewed the NIST fire dynamics simulation used in this case. (Exh. 3, depo at p.63).

(5) Franck has never testified in court using the fire dynamics simulation nor does Franck know of any specific fire cases that have used the computer model simulation. (Exh. 3, p. depo at p.64).

Such lack of experience and skill calls into question whether the fire computer model simulations were accurately performed by Franck.  It is submitted that, while Franck is a qualified electrical engineer,  as to the fire dynamics simulation (FDS) model and technology,   a sufficient foundation has not been established to qualify Franck to testify as an expert.  He has had no prior experience or training,  no observational knowledge,   no background in the general use, application and operation of the fire dynamics simulation technology.  And, he had never previously analyzed a fire case using the FDS technology.   Furthermore, Franck failed to perform a reasonable investigation into the cause of the fire by performing traditional technical electrical engineering testing of the electrical soundness of the space heater, an alternative potential cause of the fire.

Moreover,  the fire simulation technique itself has not reached the stage of verifiable certainty according to its own creators. (Exhibit 6,p. 67).

Franck presented 3 publications of the National Institute of Standards and Technology (NIST) utilized in Franck's preparation of the computer Fire model simulations.   The  three (3) publications are available on the NIST internet website,  and are entitled, NIST Special Publication 1017 – User's Guide for Smokeview Version 4 – A tool for Visualizing Fire Dynamics Simulation data,   NIST Special Publication 1018 - Fire Dynamics Simulator (Version 4) Technical Reference Guide,  and NIST Special Publication 1019 -  Fire Dynamics Simulator (Version 4) Technical Reference Guide.

Assuming that Franck correctly performed the fire computer model simulations as per the software designers instructions,   the NIST (National Institute of Standards and Technology) publication or materials on simulations  warned users that results are uncertain,  and states, as follows:

"…In cases where the fire is large relative to the enclosure, the uncertainty
 of the model is greater due both to the lack of input data for material
 properties and combustion chemistry and to greater numerical error
 in combustion and radiation transport…"   (Exhibit 4,  NIST publication 1019
 Conclusion, Chapter 6)

At his August 24, 2007 deposition,  Franck did not dispute the fact that the fire simulation computer modeling results can be uncertain.     Upon examination at his deposition on a portion of the NIST materials (Exh. 5,  depo at p. 67) ,  regarding the accuracy of the fire dynamics simulator (Exh. 3, Depo of Franck p.66, line 21-p.67, line11),  Franck testified as follows:

Question:  "In cases where the fire is large relative to the enclosure, the
                uncertainty of the model is greater due to the lack of input
                and date from material properties and combustion chemistry
                and to greater numerical error in combustion and radiation
                transport."  Would you agree with that?

Answer:    Of course.

Question: So, it is fair to say from this statement on the uncertainty of the model here, according to this own report is, is someone should be cautious or know that there are risks that are greater due to the lack of import data for material properties?

Answer: Correct

The degree of uncertainty is unknown. Does the fire simulation models presented by Franck predict a reliable outcome within an acceptable standard in the fire investigation community? Is the model correct in only 1 of every 5 fire simulations? Margin of error percentage rates are projected by NIST, but how reliable are they? NFPA 921 recognizes fire models in Reconstruction, section 17.7.5 et.al. , but also cautions the user of uncertainties accompanying the use thereof, section 20.4.8.1. And, section 17.7.5.2 warns that the "user of a fire model is responsible for ascertaining that the method used is appropriate, that the data input is proper, and that the output is properly interpreted."

Further, the NIST Webserver website states that NIST does not endorse the views expressed or the facts presented on this site. (Exhibit 6) This should be interpreted to mean that the three (3) NIST Special Publications represent the views of the authors themselves, and are not approved by NIST or the U.S. Department of Commerce.

It is submitted that since evidence of a fire simulation is proffered by defendant, and because it is undisputed that the methodology of the fire simulation is such that the results are uncertain, the *Daubert's* reliability mandate is not satisfied.

It is additionally submitted that Franck offers opinion that is too subjective in nature to be relied on as valid scientific opinion. NFPA 921 guideline concerning the rate of fire growth, section 5.4.1.2 states:

> The rate of fire growth as determined by witness statements is highly subjective. many times witnesses are reporting the fire growth from time of discovery, which cannot be directly correlated to ignition time. The rate of fire growth is dependent on many factors besides fire load, to include fuel configuration, compartment size, compartment properties, ventilation, ignition source, and first fuel ignited. The rate of growth as reported by witnesses is not reliable or supported independent evidence of incendiary fire.

Mr. Franck's analysis consists of a subjective hypothesis of the fire that does not withstand scrutiny when carefully examined. He did not perform appropriate testing, presents no evidence of the ignition time, and does not introduce any empirical evidence, e,g, trace evidence of accelerants, to support his theory of an incendiary fire.

In addition, the trial court may exclude evidence if the court determines the evidence would confuse the issues or mislead the jury. Fed. R. Evid. 403, *Fireman's Fund Insurance Company v. Canon*, 394 F.3d 1054, (2005). In this case, the fire dynamics simulations proposed by Franck are not based on reliable data, are uncertain, have not been shown to be accepted in the fire community, and may have not been properly used by Franck, resulting in erroneous results. Any probative value of such conjecture is substantially outweighed by likely confusion and the likelihood of misleading the jury.

## IV.  CONCLUSION

For the foregoing reasons,  the testimony of Mr. Franck should be excluded from this case.

UAW-GM Legal Services Plan


/s/ Richard N. Schwartz
Richard N. Schwartz #0029189
Brett A. Housley #0070612
UAW-GM Legal Services Plan
1570 S Canfield-Niles Road
Building B, Suite 101
Austintown, OH 44515
(330) 799-7711
FAX: (330) 799-5220
Attorneys for Plaintiff
Email:
RichardSc@uawlsp.com
Brettho@uawlsp.com

CERTIFICATE OF SERVICE

The  Motion in Limine to exclude testimony of defendant's
Expert has been  filed electronically on the  4th day of September, 2007.  Notice of the
filing will be sent to all parties by operation of the Courts electronic filing system and
regular U.S. Mail.

/s/ Richard N. Schwartz
Richard N. Schwartz
Attorney for Plaintiff, Mark A. Turner